JENNER, et al. *v.* COLLINS, et ux.

Division A.   May 21, 1951.

No. 37952  (52 So. (2d) 638)

Deavours & Hilbun, Stanton Hall and Ernest W. Graves, for appellants.

Welch, Cooper & Welch, Melvin & Melvin, and C. D. Gibbes, Jr., for appellees.

**Lee, J.**

E. and C. Jenner, a copartnership trading and doing business as Laurel Drive-In Theater, in August 1948, erected their theater on land about one fourth of a mile from the home of Mr. and Mrs. T. U. Collins. After the show began operating, Collins repeatedly complained that the noise was disturbing him. In the fall of 1949, he and his wife filed suit to enjoin the operation, as a nuisance, and to recover damages. The answer denied all of the allegations of the bill. In the trial, the injunctive feature was abandoned. On the final hearing, the court decreed damages in the amount of $467. The Jenners appeal.

The assignment of errors goes solely to the sufficiency of the evidence. The appellants contend that the decree is against the overwhelming weight of the evidence. Consequently a statement of the substantial facts is necessary.

The picture screen was about 30 feet wide by 40 feet long, and was built on a somewhat larger structure. It was about 220 feet from the projection room from which the speaker system was controlled. There were wings on each side of the screen to protect against other lights. There were 170 odd speakers which were set up on poles about 3½ feet high. Each of these accommodated two cars. The vast majority of the patrons attended the

theater in their automobiles, though there were some benches in the rear which could be used by persons not in cars.

Appellee, T. U. Collins, testified that, from early evening until ten or eleven o'clock at night in the showing of the pictures, there were noises, talking, music, firing of guns, shooting, and screaming of women. He thought that such sounds emanated from the screen, but the defense claimed that no large amplifiers were ever used. He and his wife were greatly disturbed, and could not rest. They were unable to keep the noise out even with the doors shut and the windows down. Mrs. Collins was suffering from high blood pressure. On his first complaint, the operator promised "to see about it", but the condition was not remedied. Two other complaints went unheeded. Shortly after suit had been filed there was a change whereby the speakers were placed in the cars and the noises were largely abated since the patrons could then regulate the tone themselves. After this change, only 27 of the out-of-car speakers remained.

Thirteen other witnesses were introduced in support of the complaint. One of them living about a fourth of a mile away heard shrill sounds like airplanes and ambulances. He also made complaint to the management. Another, living about 100 feet away testified that the condition was bad, due to talk, singing, shooting, shouting, explosions, and wrecks. Another, living three fourths of a mile from Collins, testified that he could hear talking and music over the loud speaker, and that it interfered with sleep and rest. Another, living about two miles away, said that he could hear the music, and at times it was a "jumble". Another, about 500 feet away, heard screaming, shooting, airplanes and sirens. He was unable to sleep on account of the noise and had to keep his doors closed. Another, about 150 feet away, heard hollering, screaming, horns blowing, sirens, and guns shooting. He had to keep his doors shut and windows down. Another, about 250 feet away, heard like noises from the speakers,

and had to keep the doors shut and windows down. This witness could not sleep and was miserable. The evidence of the other witnesses was corroborative.

E. Jenner testified for the appellants. He admitted that Collins complained to him, and that the sound was turned down. He also admitted that he stood outside Collins' house and heard the sound, but said that it was very low. After the new speakers were installed, no sound was audible. Twenty-nine other witnesses, living at various distances from the theater, testified for the appellants. Many of these admitted that they could hear the noise before the new speakers were installed, but stated that it was not disturbing to them. Others hadn't even noticed any noise.

On this sharply disputed issue, the learned chancellor found as a fact that appellees were disturbed to some extent—"not very much but undoubtedly some." The credibility and worth of their evidence was peculiarly within his province as the trier of facts. His finding is sustained by substantial evidence, and it cannot be said, therefore, that he was manifestly wrong.

"Noise may be a nuisance where it is of such a character as to be productive of actual physical discomfort and annoyance to a person of ordinary sensibilities." 66 C. J. S., Nuisances, Sec. 22(a), page 772. And, "whether noise constitutes a nuisance ordinarily is one of fact . . . depending on all the attending or surrounding circumstances." 66 C. J. S., Nuisances, Sec. 22(d), page 774.

In the case of Mississippi Power Co. v. Ballard, 170 Miss. 479, 153 So. 874, 875, it was said: "There are numerous authorities supporting the view that recovery may be had for noise when it is of such character and intensity as to so unreasonably interfere with the comfort and enjoyment of private property as to constitute private nuisance and materially diminish the market value of such property. 20 R. C. L. 445, and authorities there cited."

Even in Dean v. Southern Railway Co., 112 Miss. 333, 73 So. 55, 56 L. R. A. 1917C, 346, it was said: "It may be conceded that noise, under some circumstances, may be so great as to amount to a private nuisance . . ." In that case, however, liability against the railroad company was denied because the noise occasioned by the use of the spur truck was no greater than was necessary in the operation of the trains and in needed switching. But see also Robertson v. New Orleans & G. N. R. Co., 158 Miss. 24, 129 So. 100, where the distinction between public and private functions is reviewed, and it is pointed out that, although there would be no liability for a nuisance in the first instance, such liability could exist in the latter.

There is great similarity between the facts in this case and those in Anderson v. Guerrein Sky-Way Amusement Co., 346 Pa. 80, 29 A. (2d) 682, 684, 144 A. L. R. 1258. In that case, the theater was operated from 8:30 in the evening to as late as 1:30 at night "with noises of varying degrees of continuity and intensity and consisting of music, singing, talking, shouting, shrieking, gunplay, raucous laughter, 'mob scenes', amplified airplane noises and other types of sounds, carried to the homes of the plaintiffs in such a manner as to disturb their rest, interfere with their ordinary conversation, distract them from reading and working, make necessary the closing of windows on hot summer nights and keep them awake even with the windows closed, interfere with their entertainment of guests, drive them from their grounds and porches into their houses, force them to abandon the use of their bedrooms having southern exposure, and on occasions compel some of them to leave their homes entirely for the evening in order to escape from the intolerable noises." Under those circumstances, the court there said: "No man has the right to take from another the enjoyment of the reasonable and essential comforts of life and, consequently, cannot commit acts on his own premises calculated to interfere with the reasonable enjoyment by others of their homes."

■■ ■ In dealing with the excuse that the theater was not able to obtain certain equipment to reduce noise because of war conditions, just as, in the case before us, the appellants sought to be excused for failure to install in-car speakers in the cars, again that court there said: "The operation of the theatre is neither a public duty nor a private necessity, and if defendants cannot operate it, for whatever reason, without depriving plaintiffs of the normal enjoyment of their homes, they must abondon the enterprise altogether. Inability, because of war conditions, to obtain priorities on material may excuse the nonperformance of a contractual obligation . . . but certainly not the maintenance of an unnecessary nuisance."

Affirmed.